Mr. Justice Walker delivered the opinion of the Court. Uichard Pryor filed his bill against the appellants for the purpose of rescinding a contract for the purchase of certain lands, to recover the purchase money which had been paid on such contract, and to perpetually enjoin the collection of that part which remained unpaid. Two distinct grounds of fraud are alleged: First. Fraud in respect to the quality of the land sold and also in its relative situation to other lands: Second. In respect of the title to the land sold. There are several interesting questions presented for our consideration, which result from the peculiar circumstances in which the parties were placed. Their respective means of information, the purposes for which the contract was entered into, as well as the subsequent conduct of the parties — all these must necessarily be kept in view in order to a proper understanding and application of the rules of law which will govern this case. It is not every misrepresentation of the vendor in regard to the property sold, which will amount to fraud, be it ever so exceptionable in point of morals. The misrepresentation, in order to affect the validity of the contract, must relate to some matter of inducement to the making of the contract, in which, from the relative position of the parties and their means of information, the one must necessarily be presumed to contract upon the faith and trust which he reposes in the representations of the other on account of his superior information and knowledge in regard to the subject of the contract: for if the means of information are alike accessible to both, so that, with ordinary prudence or vigilance, the parties might respectively rely upon their own judgment, they must be presumed to have done so : or if they have not so informed themselves, must abide the consequences of their own inattention and carelessness. Such representations, therefore, to amount to fraud, must be of a decided and reliable character, holding out inducements, to make the contract, calculated to mislead the purchaser and induce him to buy on the faith and confidence of such representations, and in the absence of the jj means of information to be derived from his own observation J and inspection, and from which he could draw conclusions to Í guide him in making the contract independent of the representations of the vendor. Hall vs. Thompson, 1 S. & M. 443. Mississippi Union Bank vs. Wilkinson, 3 S. & M. 78. Ayrs vs. Mitchell, 3 S. & M. 683. And first, with regard to the parties and their relative means of information in regard to the matter contracted for, at the time of making the contract. It appears, from the facts of record, that Pryor was moving his slaves and personal estate to Arkansas, and being desirous of obtaining a situation on the bank of the Mississippi river, on which to open a farm and place a portion of his slaves, had purchased two donation claims, with which he could locate 640 acres of any of the unappropriated lands in the district subject to entry: and, being a stranger in the country, upon inquiry, was informed that defendant, Yeates, of Helena, was a gentleman in whom he might place implicit confidence, and who, from an intimate and long acquaintance in the country, was well qualified to give him information relative to the most valuable locations to be made in that vicinty. Upon his arrival at Helena, he met with Yeates, and communicated to him the object of his visit, which was to purchase a small tract of land in front of the river contiguous and adjoining to which were good vacant lands above overflow, upon which to locate his claims, making the two so acquired to constitute a tract situated and suitable for a plantation : and that, unless he could find good lands back of the front on which to locate his claims, he did not wish to purchase front lands. Yeates at once responded that he himself owned front lands of the description given, in connexion with which there were back lands subject to location by such claims, which were above overflow and of good quality. That Pryor was a stranger in the country, and had never seen the lands, is a point conceded; and, from the fact that his slaves and personal estate were on the way, and expected to arrive in a day or two, and that his avowed purpose was to place them at once upon it, it will be perceived that the circumstances were unfavorable to such examination. It is evident, therefore, that the purchase was made on the faith and trust which Pryor placed in the statement of Yeates, and that he had done all which, under the circumstances, a prudent man should be required to do. He had not only inquired into the means of information and character of Yeates, but had openly laid before him the object and purpose which induced him to purchase front lands, and without which it would not suit him to purchase. The next inquiry, therefore, is, whether the representations so made were, in fact, true, or false and deceptive. Whilst it is evident that neither the lands sold nor those in the rear, and on which the claims -were to have been located, were altogether such as they were represented to be by Yeates to Pryor, the extent of the misrepresentation is a matter of some doubt; in order to determine which, it becomes necessary to review a portion of the testimony. And it may be well here to remark that, in weighing the evidence, we will not be understood as attaching importance to slight misdescriptions. Yeates must be understood, when he speaks of high bottom land, free from overflow, as meaning such as is free from all except extraordinary overflow, according to the common sense meaning attached to such terms in relation to Mississippi or other bottom lands by those accustomed to speak of them, unless by the particular language used in connexion with those terms, a different meaning would be most natural. Nor is the present condition of the land as resulting from causes in the change of the current by cut-off or otherwise, to be taken into consideration, nor indeed the state of the overflow at any time or under any circumstances since the contract, only so far as may tend to show what the elevation of the land truly was when the contract was made. The bill charges that the complainant represented to Yeates that he wished to buy a small tract of front land, above overflow, in the rear of and adjacent to which were good lands subject to location, on which he could locate two donation claims, so as to enable Mm, by uniting the front lands with those to be entered in the rear, to make a convenient tract on which to open a farm, and that, unless he could make such location back, he did not wish to purchase front lands. To which, Yeates responded that he himself owned a tract of that description, fronting on the Mississippi river, in the rear of which were fine public lands contiguous and adjoining to said front, and of good quality, and above overflow, subject to be located by such claims. To this specific allegation, Yeates, in his answer, replies and admits that complainant did apply to him for information in regard to such lands so situated, and that defendant did thereupon propose and offer to sell the lands in the bill mentioned, which he represented to complainant as being as high front lands as the generality of land in the region of the country on the river, and which had not been overflowed since the extraordinary freshet of 1828, and that there was a ridge of good unappropriated public land adjoining the south-west part of said front lands, running in a south-west direction almost parallel with the river, on which said claims could be located; which locations, he agreed to assist in making. But denies that such agreement was part of the contract, and says that, at the same time that he made the contract and told complainant that there were good lands at the south-west end of the tract, he also told him that the public lands at the upper or north end of the tract sloped off towards a bayou, and were wet and not worth locating, but that the claims could be so located as to connect the claims to advantage; that the ridge of lands at the south-west was about a half mile wide at the commencement and widened for several miles; that it was as high as the front lands, and had not been overflowed since 1828. Had the answer stopped at this point, it might be considered an admission of the allegations in the bill, except so far as relates to the local situation of the vacant lands, the bill charging that they were to be connected with back lands, and the answer that the lands were to have been located at the southwest end of the tract. But the further answer of the defendant to a conversation on the boat the next day, makes it a matter of doubt whether the contract was not originally as stated in the bill. He says, in further answer, that no new facts were stated by him. on the boat; he might have given a more minute description of the lands, but they were substantially the same as those made at the execution of the contract. He then admits that he did ask Pryor if it would make any difference if the claims were located a short distance back of the said front lands, because the lands, from a half mile to a mile back, were higher and wider, and such location would be in a better shape. And that it was for this reason, and not but that the adjoining lands were good and fit for cultivation that he made such inquiry. In justice to the defendant, it may be that, in this latter version, he intended to be understood as referring to the location at the southwest corner of the tract. If so, his language, to say the least of it, is equivocal, and so tends to give credit to the statement of complainant and the positive oath of the witness who was present at the time the contract was made, and who fully sustains the complainant, as well as the probability of the facts from the object which Pryor had in view, that we must conclude that the statements in the bill are sustained in proof with regard to the terms of the contract itself. The testimony in regard to the quality and local situation of the front lands, as well as those in the rear, when taken together, tend, with reasonable certainty, to establish the facts, that all of the lands sold or in the vicinity, which were subject to entry, -were overflowed in 1828, 1832 and 1836 ; that the overflow of 1828 was two feet higher than either of the others; that nearly one-third of the front lands sold to Pryor, was subject to ordinary overflow, the residue as dry and good land as any in the neighborhood, and considered high bottom land, free from ordinary overflow; that there was no land north or west of the land sold to Pryor which was fit for cultivation, at least for some miles, if within the township; that there was a ridge of land which connected with the Pryor tract at the south-west end and passed through sec. 23 about a half mile wide at the commencement and widening for several miles, which was considered high bottom land; that all the vacant land fit for cultivation within a mile of the Prior lands was in section 23; that something exceeding half the north-half and about half of the south half of said section was good land, all of it was overflowed in 1828, 1832 and 1830; that the cut-off, some five miles above, was open for boats in 1841, and threw an increased quantity of water upon the bottom, including the Piyor lands, about two feet deeper than was usual before the cut-off. These being the facts, instead of the statement made by Yeates to Pryor, when he agreed with regard to the land, suppose he had stated to him that he was the owner of a tract of front land, two thirds of which, although it had been overflowed in 1828, 1832, and 1836, were considered good dry bottom land free from all ordinary overflow, the residue subject more or less to ordinary overflow; that the lands on the north and west (or back lands) were valueless for miles back, but that at the south west and adjoining the corner of said front lands there was a section of land, about half of which was good dry bottom land free from all ordinary overflow, although overflowed in 1828, 1832 and 1836, is it probable that Pryor would have consented to purchase the front lands ? We think not: for in our opinion neither in locality nor description did the back lands fill the reasonable expectation of any one, from the description given by Yeates. Not that it is expected when speaking of a good location, or good land that it is all to be good. There are few tracts which have not some spots of indifferent land. But the quantity of indifferent land in this instance was so great, and also its position such, as to render it improbable that Pryor would have purchased had he been truly informed; and it is in our opinion such a misrepresentation as amounts to a fraud upon Pryor. It is contended for the appellants that even if there was such fraud in the misrepresentation of Yeates as would have authorized Pryor to rescind the contract, yet by his conduct and acts since the discovery of the alleged fraud in this respect, he has elected to affirm the contract and should not be heard at this time to complain. To determine this it becomes necessary to look into the evidence upon this point. The first opportunity which was offered for examination of the land was some two days after the purchase was made, when Pryor landed his boat with his slaves. Making due allowance for the awkward situation in which he was then placed, with his property either to be landed or shipped further, it seems to us that a restlessness and haste were displayed and an undue credit given to the statements of mere strangers, whose motives for misrepresentations might well have been suspected, particularly Johnson, who was a drunken intruder on the land. Pryor’s stay according to the evidence did not exceed two hours, in which time he held his conversation with Johnson, visited Williams and conferred with him, and devoted the balance of his time in making a very partial examination of the land purchased by himself. That the result of this examination had not the effect to induce him to abandon and repudiate his purchase is quite clear, for, so far from it, he spends a portion of his time in treaty with Williams for his lands and another portion directing and forbidding the cutting of timber upon the land purchased of Yeates. Whether therefore doubts or distrust of the imposition put upon him by Yeates, entered into and formed a part of the motive for his precipitate abandonment of the land, it is evident that he did not intend relinquishing his purchase at that time. His first letter to Yeates, (only six days after he left the lands) was designed to withdraw .the claims from the hands of Yeates, and it was not only natural but necessary that he should render to Yeates some excuse or apology for thus suddenly changing his purpose. Admitting it to have been true that this back location was the leading inducement to the purchase, it is singular that when the proposition to withdraw the claims was made, he did not accompany it with an avowed repudiation of the whole contract, at least if his examination was such -as to arouse suspicion that he had been imposed upon by Yeates in the representations in regard to the quality of the land. We hold it to have been his duty as well to Yeates as to himself to have taken steps within a reasonable time to determine certainly the condition of the land and the extent of the fraud. This he neglected to do until 1840, more than two years after the contract, when he employed Maddox to make a personal examination of the land. It will not do to say that he was ignorant of the fraud; enough was developed to put a prudent man upon inquiry; nor that he was in treaty for compromise, unless there had been some indications of his ultimate intentions in case the compromise should fail. So far from this, although repeated offers were made by Pryor, to pay an additional sum to Yeates if he would relieve him from the contract, yet ho in almost every instance coupled it with a promise to pay, and with an explanation and excuse for having delayed payment. Yeates had rights as well as Pry- or, which should be guarded. If this contract was not to stand it was but just and fair that he should know it, that he might make other disposition of his property. Pryor was at once put upon inquiry; indeed from his own admissions convinced that a fraud had been practiced upon him, and it was his duty to have satisfied himself at an early day thereafter and to indicate his determination to Yeates. No one can doubt after reading Pry- or’s letters to Yeates but that he held himself bound to pay although he thought the contract a hard one under the circumstances. In view of all the facts of the case therefore, upon this specific ground of fraud, whilst we are satisfied that a fraud was practiced upon Pryor by Yeates, of which Pryor might have availed himself to set aside the contract, yet by his neglect and subsequent promises and conduct he waived this advantage, and so far as regards fraud in the description and quality of the land he is not entitled to relief. Having thus disposed of the first allegation of fraud, we will proceed to dispose of the second: Fraud in the representation of title to the land. It is expressly charged in the bill and admitted by the answer of Yeates, that Yeates represented to Pryor that he owned the land and would endorse the certificates of his entry so that patents could issue directly to him for the same, and the exhibits attached to the bill show that Yeates so understood the contract at the time, for it is there seen that he did acknowledge certain transfers and directions to that effect before Davis Thompson, then Receiver of said land office, which, although they purported to effect that purpose, did not in fact do so; for, upon inspection thereof, it will be perceived that in fact Yeates had no power to make such transfer, and that the same in truth conveyed no title whatever to Pryor. Now when it is remembered that Pry- or was there a stranger in the country, presumed to be unacquainted®with such transfers and their legal effect, but which were sanctioned by an officer of the United States government who recognized and approved such transfer, when he himself, in regard to part of the lands, held adversely to Yeates, as Yeates himself admits, there is to our minds abundant proof of a most gross and premeditated fraud practiced by Yeates on Pryor with regard to the character of title he was getting, as well as the interest which Yeates had in the land at the time of the purchase. Could Pryor have supposed for one moment thathe was by those transfers acquiring, as regarded at least a part of the land, not even an equitable title, is it to be presumed that he would have paid $1000, in cash and have executed his notes for $6,615 00 payable in January 1838, and 1839, thereafter ? It is evident that he would not. But it is contended that although Yeates did misrepresent the character of title by which these lands were held, yet Pryor should not complain inasmuch as he has since purchased a perfect title, which he tenders and offers to him. It is true that where there has been no fraud and the vendee has entered and holds peaceable possession under an executed contract of conveyance, he cannot ordinarily come into a court of equity for relief but must resort to his common law action upon his covenant or warranty of title. Abbot vs. Allen, 2 J. C. Rep. 523. Tallmage vs. Wallis, 25 Wend. 114. Miller vs. Long, 3 Marshall 336. Chesterman vs. Gardner, 5 J. Ch. Rep. 31. 6 S. & M. 345. But it is well settled that where there is fraud whether in respect to the title or representations of the property, and that is the allegation upon which the vendee relies for a recision of the contract, a court of equity will grant relief. 1 Sug. Vend. 284. Hensley vs. Johnson, 2 Bibb 12. Livingston vs. Penn. Iron Co. 2 Paige 391. Gill vs. Corbin, 4 J. J. Mash. 392. Denison vs. Morris, 2 Ed. Ch. Rep. 42. Burbecs vs. Blanton, 1 J. C. Rep. 213. Chesterman vs. Gardner, 5 J. Ch. R. 29. Young vs. Harris adm. 2 Ala. 111. Weatherhead vs. James, id. 173. Camp vs. Camp. id. 634. Woodruff vs. Bunce, 9 Paige 444. Taylor vs. Porter, 1 Dana 422. And such relief will be granted even though the ven-dee may not have been divested of possession, 1 Sug. Vend. 284. Young vs. Harris, adm. 2 Ala. 110. There is a sensible distinction to be observed between suits at law for a breach of covenant for title and quiet possession, and to rescind contracts. In the suit at law the party relies upon his contract and seeks to recover damages for a breach of it; whereas in suits to rescind contracts, the ground of complaint is not that the conditions of the contracts have been broken merely, but that the contract was in its inception fraudulent and should not be enforced. In such cases whether the vendee remained in possession of the property or not until the decree is a question addressed to the conscience of the chancellor in adjusting the points of equity arising in the case as connected with rents, improvements, interest and such other incidental equities as may attend the contract. There is a very marked distinction between executed contracts where the vendee has accepted a deed and entered into possession, and an executory contract where the vendee is called upon to approve and accept a title in affirmance and completion of such contract. When lie has accepted a title he is presumed to have examined the evidences thereof and held them sufficient; and, in the absence of fraud, must in most cases rely upon his covenants of warranty and show that he has been evicted before he is heard to complain. Miller vs. Long, 3 A. K. Marshall 336. Cullum vs. Branch Bank Ala. 4 Ala. 29. Woodruff vs. Bunce, 9 Paige 444. Tallmage vs. Wallis, 25 Wend. 115. Bates vs. Delevan, 5 Paige 300. Simpson vs. Hawkins, 1 Dana 305. But the case is very different where, under an executory contract, the vendor presents his title. The vendee is put upon inquiry and has a right to demand such title as he contracted for. Weatherford vs. James, 2 Ala. 173. Sebring vs. Mersereau, 9 Cow. 345. 2 Sug. Ven. 111. The title offered by the vendor should be clear and free from incumbrance, doubt or suspicion. 2 Sug. Vend. 110. Payne vs. Cabell, 7 Mon. 202. Miller vs. Long, 3 A. K. Marshall 336. Cummins vs. Doyle, 1 J. J. Marsh. 481. Cullum vs. Branch Bank Ala 4 Ala. 28. The question recurs, has Yeates or Johnson, who holds the note by assignment and who must be considered as identified in rights with Yeates, presented to Pryor such perfect and clear legal title to the lands sold as will amount substantially to a compliance with his contract? It is contended for Pryor that the title must be precisely such as was contracted for; .that is, if Yeates contracted that Pryor should take the title directly by patent to himself, no other title, however valid and perfect, will excuse him from such compliance, nor was Pryor bound to accept any other. The authorities cited do not very fully sustain the objection in this instance. It is true that, when the vendor covenants to convey, he must offer a perfect title, that is, one free from doubt or suspicion; and there are several authorities which go to the extent that the vendor cannot substitute another in his stead to make the warranty of title, for the reason that, if he could do so, lie might offer one less solvent and able to remunerate the ven-dee, should the title fail, as in the case of Taylor vs. Porter, 1 Dana 422, which by analogy may go to sustain the position assumed. Yet we are not prepared to say that in this case it can' be sustained in point of fact Yeates, it is true, in attempting to convey title to the land, assumed that such would be the effect of his transfers. The contract however was that Yeates himself was the owner of the land and would convey; so that if Yeates should tender a perfect title at the trial of the cause, whether held as patentee or by purchase, it would, in our opinion be sufficient. For in that event the recourse of Pryor on the warranty would be directly against him, which is the greatest extent to which the Kentucky decisions have gone. Turning then to the evidences of title which were offered, we find that 161, 92-100 acres of the land were patented to Yeates as the assignee of Garner and Trent, for which a deed was regularly acknowledged and recorded from Yeates to Pryor: to this extent we think the title sufficient. We also find that 144 96-100 acres of the land were patented to Johnson and Thompson and conveyed by deed to Yeates and from Yeates to Pryor: this title we think sufficient. As regards the residue, 160 acres, patented to^Lucas and Welborn, it seems that they held floating pre-emption Yiglits, or the right of each to locate 80 acres of the surveyed unappropriated public land, by paying therefor the government price, which floating rights they conveyed to Yeates for the consideration of $200; and, in the covenant of sale of such floats, constituted Yeates their agent and attorney to locate the claims and sell and make title to the lands to be located. Under this power Yeates conveyed the two 80 acre tracts, on which said claims were located to Pryor. And it is insisted for Yeates and Johnson that this conveyance passed to Pryor a perfect title to said land. It appears from the evidence that both Lucas and Welborn died before the deed from Yeates to Pryor was executed. There can be no doubt as a general rule that the death of the principal is a revocation of the power, even though in express terms it is declared to be irrevocable, unless the power is coupled with an interest, not in the thing to be obtained by such power, but in the estate itself. Story on Agency 620. Watson vs. King, 4 Camp. 273. 8 Wheaton 174. Hunt vs. Rossman’s adm. id. 201. In the case of Watson vs. King, 4 Camp, it was held that a power of attorney coupled with an interest is instantly revoked by the death of the grantor, and any act done under it after such death by the grantee is a nullity. Lord Ellenboeough remarked “that a power coupled with an interest cannot be revoked by the person granting it, but it is necessarily revoked by his death.” This rule seems to have been limited and qualified by Chief Justice Marshall in the case of Hunt vs. Roseman's adm. 8 Wheat. 174, to cases where the attorney had not such legal title to the property itself as to enable him to transfer it in his own name notwithstanding the death of the principal, otherwise it would be necessary to make the deed in the name of the principal, which could not be done when there was no such person in being. In delivering his opinion he said “We think it well settled that a power of attorney, though irrevocable during the life of the party, becomes extinct by his death. The power must be executed in the name of the party who gave it, and the title necessarily passes out of the person in whom it was vested, only by a conveyance in his own name, and this cannot be exe-ecutd by another for him, when it could not, in law, be executed by himself. A conveyance in the name of the person who was dead at the time would be as manifest absurdity.” “The general rule, that a power ceases with the life of the person giving it, admits of one exception. If the power be coupled with an “interest,” it survives the person giving it and may be executed after his death. As this position is laid down too positively in the books to be controverted it becomes necessary to inquire what is meant by the expression “a power coupled with an interest.” Is it an interest in the subject on which the power is to be exercised, or is it an interest in that which is produced by the exercise of the power? We hold it to be clear that the interest which can protect a power after the death of the person who creates it, must be an interest in the-thing itself. In other words, the power must be engrafted on the estate in the thing.” “A power coupled with an interest is a power which accompanies or is connected with an interest. The power and the interest are united in the same person. But if we are to understand by the word “interest” an interest in that which is to be produced by the exercise of the power, then they are never united. The power to produce the interest must be exercised, and by its exercise is extinguished. The power ceases when the interest commences, and therefore cannot, in accurate law language be said to be “coupled with it.” This opinion is entitled to high consideration and is directly in point. At the time this power of attorney was executed, there was no estate with which it coupled an interest. It was a power to create an estate, with power to dispose of such estate when created. The power then could not, by possibility, be said to have attached to an estate, and if it had reference to no definite estate it could not create an interest in it, unless it could be shown that an interest could be created in that which had no existence. In the language of Chief Justice Marshall then, this power was to produce an interest, and was not coupled with an interest in an estate then in existence. A title in the estate never did exist in Lucas and Welborn until after the patent issued; and the power to convey has reference to a conveyance after the patent issued, in the event that it should issue in their names. Under this state of case the authorities are clear that the power was revoked by their death; and as Yeates had no power to convey, no title passed by the deed which he executed to Pryor as the agent of Lucas and Welborn. There is another objection urged to this title, which is, that the wife of Welborn survived and was in being at the time the deed was executed, and, being entitled to dower in said lands, had not joined in executing the deed from Yeates to Pryor. It is unnecessary to examine this objection as we have already disposed of the question of title in Yeates to these lands. It may not be amiss, however, to remark that it is very questionable whether the widow would, under the circumstances of the case, be entitled to dower,for although the husband, had he lived, would have held the legal title, it is not altogether clear that he had not so contracted as to create a limited legal estate in which the widow could not assert her right to dower. To this point 1 Roper Husband & wife, 351. 4 Kent's Com. 42. Cortair vs. Clark, 2 Edwards 437, are authorities worthy of consideration. It only remains to be determined, under the circumstances, whether the decree in this case should be in affirmance of the contract, so far as the title is perfect, with suitable relief as to the contract for the balance, or should the whole contract be rescinded. There can be no doubt that the defect in the quantity sold may be of such a nature, or of such an extent, as to entitle the ven-dee to a recision of the contract. On the other hand, it may be so small, or of such a nature as to afford no solid objection to the specific execution of the contract. It is difficult to lay down any general rule upon the subject: each case must, of necessity, depend on its own peculiar circumstances. Reynold vs. Vane, 4 Bibb 215. Cumins vs. Boyle, 1 J. J. Marsh. 481. Bollock vs. Wilson, 3 Dana 26. Buck vs. McCantry, 5 Mon. 230. McCorn vs. Delany, 3 Bibb 48. Moredock vs. Rawlings, 3 Mon. 76, are cases where specific performance was, under various circumstances, decreed, although it appeared that the vandee could not get the benefit of his whole contract. The court, in these cases, seems to have been mainly influenced by the consideration that the deficit was so small or unimportant as not very materially to affect the interest of the parties. There is, however, this distinction between the position of the vendor and the vendee, which should be kept in view. The ven-dee has a right to insist upon his whole contract according to its terms, unless the objection is unreasonable and iniquitous on account of the comparatively small deficit, whilst the vendor is not to be heard to object to the performance of his contract, unless under similar circumstances. And the authorities are very clear that the vendee may, if he choose to do so, insist on the affirmance of such part as the vendor has it in his power to perfect. In the case of Mortlock vs. Buller, (10 Ves. 315,) Lord Eldon said : “I also agree that if a man have a partial interest in an estate, and chooses to enter into a contract respecting it and agree to sell it as his own, it is not competentfor him afterwards to say, though he has valuable interests, he has not the entirety, and therefore the purchaser shall not have the benefit of his contract. Eor the purpose of this jurisdiction, the person contracting under those circumstances, is bound by the assertion in his contract: and if the vendee chooses to take as much as he can have, he has a right to that and to an abatement; and the court will not hear the objections by the vendor that the purchaser cannot have the whole.” To the same effect are the decisions in the cases of The Attorney General vs. Gower, 1 Vesey 218. 1 Ves. p. 221. 2 Brock. Cas. 118. Travis vs. Waters, 9 J. R. 465. Weatherford vs. James, 2 Ala. 173. Camp vs. Camp, id. 634. Jones vs. Shackelford, 2 Bibb 410. Campbell vs. Whittington, 5 J. J. Marsh. 100. Step vs. Akin, 2 A. K. Marsh. 259. In this case, the vendee asks that he may be relieved from the whole contract, and we think it clear that he is entitled to the relief sought, unless the quantity to which the vendor is unable to make title should be so small and unimportant as, in a matter of conscience, to forbid that he should capriciously insist upon his contract. It is evident that Yeates is unable to make title to two of the tracts sold exceeding in quantity one-third of the whole connected tract, and that the tracts, to which no title can bo made, are so situated and connected with the residue of the tract as not only to defeat his purchase to that extent, but impair the value of the whole purchase in view of the object and design of the purchase itself. We think, therefore, that Pryor should not be compelled to accept any part of the land, but may well ask to have the whole contract rescinded. It is argued, however, that Pryor has suffered the land to be sold for taxes, and is unable to re-instate the vendor in the enjoyment of his estate, and therefore the contract should not be rescinded. This position we think not sustained by the proof, and cannot therefore be heard in objection to the decree of the coui’t below. Having thus disposed of the several points presented upon the record and argued with much ability by counsel, in view of the whole case, and the decree rendered by the circuit court, we are of opinion that there is no error in the decree, and that the' same should, in all things, be affirmed. Let the decree of the circuit court be affirmed with costs.